UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LEE MOROF AND TERI MOROF,

    Plaintiffs,

v.

UNITED MISSOURI BANK, WARSAW,

    Defendant.
                                        /

Case No. 08-10526

Honorable Nancy G. Edmunds

**OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [20] AND DENYING PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT [21]**

This case involves five checks written by Plaintiffs Teri and Lee Morof ("Plaintiff," "Morof," or "Drawer") and paid by Defendant United Missouri Bank ("Defendant Bank," "Payor Bank," or "Drawee Bank"). Plaintiffs' complaint alleges that Defendant Bank wrongfully paid out proceeds on those five checks because they were not endorsed by the named payee and asserts (1) a claim for recredit to its account under Michigan's version of the Uniform Commercial Code ("U.C.C."), Mich. Comp. Laws Ann. § 440.4401, *et seq.*; and (2) negligence.[1] Defendant Bank asserts affirmative defenses, arguing that Plaintiffs suffered no damages as a result of its conduct because (1) the intended payee ultimately received the check proceeds as evidenced by (a) Plaintiffs' receipt of funds in return for their investment checks, and (b) no intended payee has come forward demanding payments owed under agreements Plaintiffs made with the individual who endorsed the five

---

[1]Plaintiffs concede in their cross motion for summary judgment (at 2, n.2) that success on their U.C.C. claim will provide full relief and thus moot their negligence claim.

investment checks; and (2) the injury to Plaintiffs, i.e., the loss of money invested with Edward May, would have occurred even if Defendant Bank had fully performed.

This matter is now before the Court on the parties' cross-motions for summary judgment. For the reasons stated below, this Court GRANTS Defendant's motion for summary judgment and DENIES Plaintiffs' cross motion.

I. Facts

A. Parties

Plaintiffs have investment accounts with Fidelity and checking accounts with Defendant Bank. Defendant Bank and Fidelity Investments ("Fidelity") are parties to an agreement for checking account services (the "Agreement"). Pursuant to the Agreement, Defendant Bank established and maintained a zero-balance processing account for Fidelity (the "Account") for the purpose of giving Fidelity's customers the ability to draw checks on their Fidelity investment accounts. When a Fidelity customer draws a check on an account, the payee or holder in due course, of the check may present the check for payment either by presenting it for payment at Defendant Bank or by depositing the check with another financial institution, which then presents the check for payment (either directly through the Federal Reserve Bank or through another financial institution) to Defendant Bank. (Trent Aff. ¶¶ 6-9.)

Once a Fidelity customer's check is presented, Defendant Bank transmits to Fidelity the name of the Fidelity account holder and the amount of the check. Upon receipt of this information, Fidelity wires Defendant Bank an amount equal to the checks presented that day. Upon receipt of the wire, Defendant Bank posts the funds into the Account. On the banking day following presentment, Fidelity notifies Defendant Bank if any checks should

be dishonored and returned unpaid for insufficient funds or for other reasons. Otherwise, Fidelity debits a customer's mutual fund account for the checks to be honored. Defendant Bank returns any dishonored items to the bank of first deposit through the Federal Reserve Bank and receives a credit for such items from the Federal Reserve Bank. The bank of first deposit will charge back the credit to the depositing customer. (Trent Aff. ¶¶ 10-12.)

### B. Plaintiffs Entered Into Contracts with Edward May to Purchase Membership Interests in Limited Liability Companies To Be Formed by Edward May

From 1998 through 2007, Edward P. May ("May") raised between $74 million and $250 million from approximately 500 to 1,200 investors by fraudulently selling securities in the form of interests in limited liability companies. May told investors that each limited liability company was going to install and service telecommunication equipment in various locations such as hotels and casinos. He also told investors that they would receive returns on their investments in the form of monthly payments or distributions. (Def.'s Ex. A, S.E.C. Compl. at ¶¶ 1, 14-24.)

From July 2006 through November 2006, Plaintiffs entered into Subscription Agreements in which they agreed to purchase an interest in four Michigan LLC to be formed by Edward May. (Def.'s Exs. C, F. I, and L, Subscription Agreements signed by Teri Morof; Def.'s Ex. M, Subscription Agreement signed by Lee Morof.) Details as to each transaction are as follows.

### 1. H.P. Hawaii LLC

On or about July 28, 2006, Plaintiff Teri Morof[2] received a Private Offering Memorandum, Subscription Agreement, and Operating Agreement from May. The Private Offering Memorandum set forth an opportunity to purchase membership interests in "H.P. Hawaii LLC," a limited liability company that *would be formed* by May to handle various telecommunication projects. (Def.'s Ex. B, Hawaii Offering Memo (emphasis added).) The Operating Agreement Plaintiff received identifies Edward May/E-M Management Co. LLC as the manager of H.P. Hawaii LLC, and provides that Edward May is authorized to manage the LLC, to conduct business on its behalf, and to select and maintain bank accounts on behalf of H.P. Hawaii LLC. (Def.'s Ex. D at ¶¶ 2.6, 5.1, 5.2, 5.3 and 5.7.)

On or about August 3, 2006, Plaintiff Teri Morof executed a Subscription Agreement acknowledging that she "agrees to purchase an interest in a Michigan Limited Liability Company *to be formed* and known as H.P. Hawaii LLC," and that she was purchasing a 2% interest in the project at a cost of $13,885 for each percentage purchased, for a total commitment of $27,770.00. (Def.'s Ex. C at 1 (emphasis added).) The Subscription Agreement provides that checks are to be made payable to "H.P. Hawaii LLC" and mailed to "E-M Management Co. LLC, 720 N. Lapeer Rd, Suite 202, Lake Orion, MI 48362." (*Id.* at 2.)

On August 3, 2006, the same day Plaintiff Teri Morof executed the Subscription Agreement, she issued a check payable to "HP Hawaii LLC" in the amount of $27,770.00. The check was received and endorsed by "Edward May," and posted to Plaintiffs' account at Defendant Payor Bank on August 14, 2006. (Pls.' Am. Compl., Ex. A.)

---

[2]Formerly known as Teri Cohodes. (Pls.' Resp. at 1, n.1.)

HP Hawaii LLC did not exist on the date the check was issued or the date it was posted to Plaintiffs' account at Defendant Bank. Although, HP Hawaii LLC has never been formed, a limited liability company with a similar name, "H.P. Hawaii Project LLC," was formed by Edward May on December 11, 2006, listing May as its registered agent, and notifying that the LLC will be managed by a member. (Def.'s Ex. R, Articles of Incorporation.)

The same pattern is repeated for the other three LLCs at issue in this lawsuit.

### 2.  H.P. Project Thirty One LLC

On or about August 13, 2006, Plaintiff Teri Morof received a Private Offering Memorandum, Subscription Agreement, and Operating Agreement from May. The Private Offering Memorandum set forth an opportunity to purchase membership interests in "H.P. Project Thirty One LLC," a limited liability company that *would be formed* by May to handle various telecommunication projects. (Def.'s Ex. E, Thirty One Offering Memo (emphasis added).) The Operating Agreement Plaintiff received identifies Edward May/E-M Management Co. LLC as the manager of H.P. Project Thirty One LLC, and provides that Edward May is authorized to manage the LLC, to conduct business on its behalf, and to select and maintain bank accounts on behalf of H.P. Project Thirty One LLC. (Def.'s Ex. G at ¶¶ 2.6, 5.1, 5.2, 5.3 and 5.7.)

On or about August 22, 2006, Plaintiff Teri Morof executed a Subscription Agreement acknowledging that she "agrees to purchase an interest in a Michigan Limited Liability Company *to be formed* and known as H.P. Project Thirty One LLC," and that she was purchasing a 4% interest in the project at a cost of $8,630 for each percentage purchased, for a total commitment of $34,520.00. (Def.'s Ex. F at 1 (emphasis added).) The

5

Subscription Agreement provides that checks are to be made payable to "H.P. Project Thirty One LLC" and mailed to "E-M Management Co. LLC, 720 N. Lapeer Rd, Suite 202, Lake Orion, MI 48362." (*Id.* at 2.)

On August 22, 2006, the same day Plaintiff Teri Morof executed the Subscription Agreement, she issued a check payable to "HP Project Thirty-One LLC" in the amount of $34,520.00. The check was received and endorsed by "Edward May," and posted to Plaintiffs' account at Defendant Payor Bank on August 30, 2006. (Pls.' Am. Compl., Ex. A.)

H.P. Project Thirty One LLC did not exist on the date the check was issued or the date it was posted to Plaintiffs' account at Defendant Bank. H.P. Project Thirty One LLC was formed by Edward May on February 21, 2007, listing May as its registered agent, and notifying that the LLC will be managed by a member. (Def.'s Ex. R, Articles of Incorporation.)

### 3. H.P. Hawaii Two LLC

On or about August 13, 2006, Plaintiff Teri Morof received a Private Offering Memorandum, Subscription Agreement, and Operating Agreement from May. The Private Offering Memorandum set forth an opportunity to purchase membership interests in "H.P. Hawaii Two LLC," a limited liability company that *would be formed* by May to handle various telecommunication projects. (Def.'s Ex. H, Hawaii Two Offering Memo (emphasis added).) The Operating Agreement Plaintiff received identifies Edward May/E-M Management Co. LLC as the manager of H.P. Hawaii Two LLC, and provides that Edward May is authorized to manage the LLC, to conduct business on its behalf, and to select and maintain bank accounts on behalf of H.P. Hawaii Two LLC. (Def.'s Ex. J at ¶¶ 2.6, 5.1, 5.2, 5.3 and 5.7.)

On or about August 22, 2006, Plaintiff Teri Morof executed a Subscription Agreement acknowledging that she "agrees to purchase an interest in a Michigan Limited Liability Company *to be formed* and known as H.P. Hawaii Two LLC," and that she was purchasing a 4% interest in the project at a cost of $8,520 for each percentage purchased, for a total commitment of $34,080.00.  (Def.'s Ex. I at 1 (emphasis added).)  The Subscription Agreement provides that checks are to be made payable to "H.P. Hawaii Two LLC" and mailed to "E-M Management Co. LLC, 720 N. Lapeer Rd, Suite 202, Lake Orion, MI 48362."  (*Id.* at 2.)

On August 22, 2006, the same day Plaintiff Teri Morof executed the Subscription Agreement, she issued a check payable to "HP Hawaii Two LLC" in the amount of $34,080.00.  The check was received and endorsed by "Edward May," and posted to Plaintiffs' account at Defendant Payor Bank on August 30, 2006.  (Pls.' Am. Compl., Ex. A.)

H.P. Hawaii Two LLC did not exist on the date the check was issued or the date it was posted to Plaintiffs' account at Defendant Bank.  Although H.P. Hawaii Two LLC was never formed, a LLC with a similar name, "H.P. Hawaii Project LLC," was formed by Edward May on December 11, 2006, listing May as its registered agent, and notifying that the LLC will be managed by a member.  (Def.'s Ex. R, Articles of Incorporation.)

### 4.  ATL Project One LLC

During October 2006, Plaintiffs received a Private Offering Memorandum, Subscription Agreement, and Operating Agreement from May.  The Private Offering Memorandum set forth an opportunity to purchase membership interests in a limited liability company, ATL Project One LLC, that would handle various telecommunication projects. (Def.'s Ex. K, ATL

Project One Offering Memo.) The Operating Agreement Plaintiffs received identifies Edward May/E-M Management Co. LLC as the manager of ATL Project One LLC, and provides that Edward May is authorized to manage the LLC, to conduct business on its behalf, and to select and maintain bank accounts on behalf of ATL Project One LLC. (Def.'s Ex. J at ¶¶ 2.6, 5.1, 5.2, 5.3 and 5.7.)

On or about November 3, 2006, Plaintiff Teri Morof executed a Subscription Agreement acknowledging that she "agrees to purchase an interest in a Michigan Limited Liability Company *to be formed* and known as ATL Project One LLC," and that she was purchasing a 1% interest in the project at a cost of $28,500 for each percentage purchased, for a total commitment of $28,500.00. (Def.'s Ex. L at 1 (emphasis added).)

On or about November 8, 2006, Plaintiff Lee Morof and non-party Jerry Morof executed a Subscription Agreement acknowledging that they "agree[] to purchase an interest in a Michigan Limited Liability Company *to be formed* and known as ATL Project One LLC," and that they were purchasing a 1% interest in the project at a cost of $28,500 for each percentage purchased, for a total commitment of $28,500.00. (Def.'s Ex. M at 1 (emphasis added).)

The Subscription Agreements provide that checks are to be made payable to "ATL Project One LLC" and mailed to "E-M Management Co. LLC, 720 N. Lapeer Rd, Suite 202, Lake Orion, MI 48362." (Def.'s Exs. L and M at 2.)

On November 5, 2006, Plaintiff Teri Morof issued a check payable to "ATL Project One LLC" in the amount of $28,500.00. The check was received and endorsed by "Edward May," and posted to Plaintiffs' account at Defendant Payor Bank on November 15, 2006. (Pls.' Am. Compl., Ex. A.)

On November 8, 2006, Plaintiff Lee Morof issued a check payable to "ATL Project One, LLC" in the amount of $14,250.00.[3] The check was received and endorsed by "Edward May," and posted to Plaintiffs' account at Defendant Payor Bank on November 15, 2006. (Pls.' Am. Compl., Ex. A.)

ATL Project One LLC did not exist on the dates the checks were issued or the date the checks were posted to Plaintiffs' account at Defendant Bank. Although ATL Project One LLC was never formed, a LLC with a similar name, "ATL Project L.L.C.," was formed by Edward May on March 26, 2007, listing May as its registered agent, and notifying that the LLC will be managed by a member. (Def.'s Ex. R, Articles of Incorporation.)

### C. Edward May Endorses and Deposits Plaintiffs' Checks

The proceeds of four of Plaintiffs' checks were deposited into Edward May's account at National City Bank in the name of "E-M Management Co. LLC." (Pl.'s Mot., Ex. G.) The proceeds of one check were deposited into another Edward May account at National City in the name of "T.C.A. Project LLC." (*Id.*)

### D. Plaintiffs Received Distribution Payments Deriving From These Investments Between February 2007 and July 2007

As evidenced by checks and distribution records, between February 2007 and July 2007, Plaintiffs received distribution payments in accordance with the Subscription Agreements that they signed.

---

[3]This represents Lee Morof's one-half of the purchase price for a one percent interest in the to-be-formed ATL Project One LLC.

9

Teri Morof received $7,935.60 in distribution payments from "H.P. Hawaii Project LLC" via checks issued from an account with that name and signed by Edward May. (Def.'s Ex. S, Distribution Records and Signed Check.)

Teri Morof received $9,511.68 in distribution payments from "H.P. Project Thirty One LLC" via checks issued from an account by that name and signed by Edward May. (Def.'s Ex. T, Distribution Records and Signed Check.)

Teri Morof received $9,463.36 in distribution payments from "Hawaii Project Two LLC" via checks issued from an account by that name and signed by Edward May. (Def.'s Ex. U, Distribution Records and Signed Check.)

Teri Morof received $6,335.00 in distribution payments from "ATL Project" via checks issued from an account by that name and signed by Edward May. (Def.'s Ex. V, Distribution Records and Signed Check.)

Lee Morof received $6,335.00 in distribution payments from "ATL Project" via checks issued from an account by that name and signed by Edward May. (*Id.*)

### E.  Litigation Involving Plaintiffs' Investments

On November 20, 2007, the United States Securities and Exchange Commission filed a lawsuit in federal court against Edward May and E-M Management Co. LLC alleging numerous violations of the Securities and Exchange Act. (Def.'s Ex. A, S.E.C. Compl.) The facts alleged in the S.E.C. complaint describe the same pattern of conduct described above concerning Plaintiffs' investments with Edward May and E-M Management Co. LLC.

On February 5, 2008, Plaintiffs filed this suit against Defendant Bank seeking to hold it liable for the checks they issued in connection with their investments with Edward May.

### II.  Summary Judgment Standard

10

Summary judgment is appropriate only when there is "no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The central inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). Rule 56(c) mandates summary judgment against a party who fails to establish the existence of an element essential to the party's case and on which that party bears the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

The moving party bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets this burden, the non-movant must come forward with specific facts showing that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). In evaluating a motion for summary judgment, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970). The non-moving party may not rest upon its mere allegations, however, but rather "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). The mere existence of a scintilla of evidence in support of the non-moving party's position will not suffice. Rather, there must be evidence on which the jury could reasonably find for the non-moving party. *Hopson v. DaimlerChrysler Corp.*, 306 F.3d 427, 432 (6th Cir. 2002).

**III.  Analysis**

    **A.  U.C.C. Claim for Recredit of Plaintiffs' Checking Account**

Plaintiffs claim that, pursuant to Michigan's version of the U.C.C., Defendant Bank is strictly liable and thus must recredit their checking account in the amount of $139,120.00 because this is the amount of money paid out for the five above-described checks that were endorsed by Edward May rather than the named payees. Michigan law, however, does not provide strict liability under these circumstances. Rather, it recognizes the affirmative defense that Defendant Bank asserts here – the "intended payee" defense.

In *Pamar Enterprises, Inc. v. Huntington Banks of Michigan*, 580 N.W.2d 11 (Mich. Ct. App. 1998), the Michigan Court of Appeals observed that:

> a bank may charge against the account of its customer a check or item that is "properly payable." Implicit in this rule is the notion that a bank may not charge against the account of its customer a check or item that is *not* "properly payable." Accordingly, the drawer of a check has a remedy against the drawee bank for recredit of the drawer's account for the unauthorized payment of the check in the amount of the improper amount.

*Id.* at 16 (omitting internal citations and citing Mich. Comp. Laws § 440.4401(3)). The *Pamar Enterprises* court further observed that "the intended-payee defense provides that a drawee bank is not liable to the drawer of a check for an improper payment if (1) the proceeds of the check reach the person the drawer intended to receive them and (2) the drawer suffers no loss proximately caused by the drawee's improper payment." *Id.* at 17. The rationale for the intended-payee defense is "to prevent the unjust enrichment of the drawer." *Id.*[4] The Michigan Court of Appeals recently recognized that the intended-payee

---

[4]In *Pamar*, the Michigan Court of Appeals also observed that the intended-payee defense "is also consistent with the Uniform Commercial Code's general rule regarding remedies, which provides that an aggrieved party should be put in as good a position as if the other party had fully performed and, by implication, suggests that the aggrieved party should not be put in a better position." *Pamar*, 580 N.W.2d at 16-17 (citing Mich. Comp. Laws § 440.1106).

defense satisfies another basic requirement of justice – the "imposition of liability onto the party best able to avert the fraud to begin with." *Money Source Fin. Servs. Inc. v. Ann Arbor Commerce Bank*, Nos. 270084, 270104, 2006 WL 3373072, *3 (Mich. Ct. App. Nov. 21, 2006).

The Court now addresses whether Defendant Bank has shown that the intended-payee defense applies here thus shielding it from liability.

**1. Intended Payees**

Plaintiffs argue that the intended-payee defense does not apply here because, at the time each of the five checks was paid by Defendant Bank, none of the LLCs named as a payee was formed. Defendant Bank, on the other hand, argues that the intended-payee defense does apply because, as shown from the evidence it provides, the proceeds of each of the checks reached its intended payee. This Court agrees with Defendant Bank.

First, unlike the plaintiff in *Pamar Enterprises*, there is no evidence here that Plaintiffs were required to write another check to replace one of the five originally written to the subject LLCs or otherwise paid twice for their original investment. *Id.* at 18. Here there is no aggrieved intended payee. There is no complaint that Plaintiffs' investment funds were never received or credited by an intended payee. *See Comerica Bank v. Michigan Nat'l Bank*, 536 N.W.2d 298, 301 (Mich. Ct. App. 1995). Rather, similar to the plaintiff in *Comerica*, Plaintiffs here are improperly attempting to use a U.C.C. provision to recoup their loss for making a bad investment. *Accord New Year's Nation, LLC v. JP Morgan Chase Bank*, No. 109050/07, 2008 WL 4667095, *4 (N.Y. Sup. Ct. Oct. 10, 2008) (distinguishing *Kosic v. Marine Midland Bank, N.A.*, 430 N.Y.S.2d 175 (N.Y. App. Div. 1980), on its facts, holding that the intended-payee defense applies, and observing that

"where there is no aggrieved payee," then the drawer plaintiff "has suffered no loss from the improper payment of a check.").

Second, considering the plain language of the signed Subscription Agreements, Plaintiffs cannot dispute that they were informed that they were issuing checks made payable to a LLC that was not yet formed and that they were considered "prospective investors." (Def.'s Mot. Exs. C, F, I, L, and M.) Each signed Subscription Agreement and each LLC's Operating Agreement also informed Plaintiffs that Edward May was associated with E-M Management Co. LLC.; the entity to which Plaintiffs were instructed to mail the five investment checks at issue here.

In the signed Subscription Agreements, Plaintiffs acknowledged that "E-M Management Co. LLC and its' members may refuse" the subscription and return to Plaintiffs any money "for any reason and that E-M Management Co. LLC and its' members shall have no liability of any kind whatsoever" to Plaintiffs as "prospective investor[s] for refusing to accept the subscription." (*Id.*) More importantly, the Operating Agreements for each LLC identified Edward May/E-M Management Co. LLC as the "Manager" of each LLC, provided that each LLC "shall be managed by Edward May," and further provided that the Manager will handle all the banking associated with each LLC. (Def.'s Mot. Exs. D, G, J, and N at ¶¶ 2.6, 5.1, and 5.7.) This documentary evidence refutes Plaintiffs' claim that the proceeds of the subject checks failed to reach the intended payee when they reached Edward May. Contrary to Plaintiffs' arguments here, "[e]vidence that the proceeds were not ultimately used for their intended purpose is irrelevant because the evidence illustrated that the moneys were received by the intended payee." *Meyer v. Comerica Bank*, No. 183645, 1996 WL 33324116, *1 (Mich. Ct. App. July 9, 1996). *Accord Comerica Bank v.*

*Michigan Nat'l Bank*, 536 N.W.2d at 539 (applying the intended-payee defense and observing that "plaintiff's argument that it never intended for anyone but [the named payee] to receive the proceeds of the loan is irrelevant for purposes of applying the intended-payee rule.").

Finally, in response to Plaintiffs' arguments that Edward May's endorsements were unauthorized, Defendant Bank presents unrefuted evidence that Plaintiffs received distributions on their investment checks in the manner described in their signed Subscription Agreements and the Operating Agreements. If the intended payees had not received the proceeds of Plaintiffs' five investment checks, Plaintiffs would not have received distribution checks as a return on those investments. Moreover, because Plaintiffs failed to return or otherwise refuse these distribution checks, their conduct thus ratified Edward May's endorsement on the five subject investment checks. (Def.'s Mot. Exs. S, T, U, and V.) *See* Mich. Comp. Laws Ann. § 440.3403(1) (providing that "[a]n unauthorized signature may be ratified for all purposes of this article.").

### 2. Proximate Cause of Plaintiffs' Loss

Defendant Bank has also established the second element of the intended-payee defense – that Plaintiffs suffered no loss proximately caused by their payment of the five checks at issue here. Plaintiffs seek to recover from Defendant Bank for their bad investment decisions. There is nothing to suggest that even if Defendant Bank had performed as Plaintiffs allege they should have, i.e., required Edward May to endorse Plaintiffs' checks in the name of the listed payee LLC, Plaintiffs would not have suffered the losses they seek to recover in this lawsuit. Accordingly, Plaintiffs should not be unjustly enriched for a loss Defendant Bank did not cause.

The decisions Plaintiffs rely upon from other jurisdictions are distinguishable. Neither *Kosic v. Marine Midland Bank*, 430 N.Y.S.2d 175 (N.Y. App. Div. 1980), nor *National Bank of Monticello v. Quinn*, 533 N.E.2d 846 (Ill. 1988), had plaintiffs that received distribution checks as described in investment documents thus allowing the defendant bank to establish that the intended payees received the proceeds of the plaintiffs' original investment checks. Likewise, neither *Kosic* nor *Quinn* had plaintiffs that failed to return or otherwise refuse distribution checks tied to their original investment checks thus allowing the defendant bank to establish that the plaintiffs' conduct ratified any unauthorized endorsement on those original investment checks.

**B. Negligence**

Plaintiffs' negligence claim fails to assert a duty owed by Defendant Bank that is separate and distinct from that owed under Articles 3 and 4 of Michigan's UCC. The allegations in Plaintiffs' complaint confirm this assertion.

    25.    UMB [Defendant Bank] had a duty to ensure the checks were properly indorsed.

    26.    UMB had a duty to properly negotiate the checks.

    27.    UMB breached its duty to Plaintiffs by charging the amounts represented by the checks against Plaintiffs' accounts at UMB without proper indorsements on the checks.

    28.    UMB breached its duty to Plaintiffs by withdrawing monies from Plaintiffs' accounts at UMB without proper authorization.

    29.    UMB breached its duty to Plaintiffs by improperly negotiating the checks.

    30.    As a direct and proximate result of Defendant's breach of duty, Plaintiffs have been harmed in the amount of $139,120, exclusive of costs and interest.

Plaintiffs' negligence claim fails for any number of reasons.  The Court need only address the most obvious – Plaintiffs' have not and cannot establish that Defendant Bank's conduct was the proximate cause of the monetary losses they suffered as a result of their decision to invest in what turned out to be a Ponzi scheme.

## IV.   Conclusion

For the above-stated reasons, Defendant's motion for summary judgment is GRANTED, and Plaintiffs' cross-motion for summary judgment is DENIED.


s/Nancy G. Edmunds
Nancy G. Edmunds
United States District Judge

Dated:  April 30, 2009

I hereby certify that a copy of the foregoing document was served upon the parties and/or counsel of record on April 30, 2009, by electronic and/or ordinary mail.

s/Carol A. Hemeyer
Case Manager